UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**Sealed**
Public and unofficial staff access to this instrument are prohibited by court order.

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | Criminal No. **19 CR 600** |
| v. § | UNDER SEAL |
| § | |
| JONATHAN ROSENFIELD, M.D. (1), § | United States Courts |
| ELMER TAYLOR (2), § | Southern District of Texas |
| ALANTHA STEWART a/k/a § | FILED |
|    Alantha Taylor (3), § | AUG 2 0 2019 |
| KWANA BROUSSARD (4), § | |
| RICKY WAYNE MOTEN (5), § | David J. Bradley, Clerk of |
| SOKARI MANUEL § | |
|    BOBMANUEL, R.P.H. (6), § | |
| ARDELLA FISHER, F.N.P. (7), § | |
| ENNA AMEDOME, F.N.P. (8), § | |
| OTUKAYODE ADELEKE § | |
|    OTUFALE a/k/a John Kayode § | |
|    Mitima-Samuel (9), § | |
| JASMINE MAYNES (10), § | |
| JABRAI PRICE (11), and § | |
| SHAWNEECE DEYAMPERT (12) § | |
|    Defendants. § | |

## INDICTMENT

The Grand Jury charges:

### GENERAL ALLEGATIONS

At all times material to this Indictment, unless otherwise specified:

1.    The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

2.    The CSA and its implementing regulations set forth which drugs and other substances are defined by law as "controlled substances," and assigned those controlled substances

to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

3. A controlled substance assigned to "Schedule II" meant that the drug had a high potential for abuse, the drug had a currently accepted medical use in treatment in the United States, or the drug had a currently accepted medical use with severe restrictions.

4. Pursuant to the CSA and its implementing regulations:

   a. Oxycodone was classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12(b)(1)(xiii). Oxycodone, sometimes prescribed under brand names, including Roxicodone, was used to treat severe pain. Oxycodone, as with other opioids, was highly addictive.

   b. At all times relevant, and as of October 6, 2014, Hydrocodone was classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12(b)(1)(vi). Prior to October 6, 2014, Hydrocodone was classified as a Schedule III controlled substance. Hydrocodone, sometimes prescribed under brand names including Norco, Lortab, and Vicodin, was used to treat severe pain. Hydrocodone, as with other opioids, was highly addictive.

   c. Carisoprodol, was classified as a Schedule IV controlled substance. Carisoprodol, sometimes prescribed under the brand name Soma, was a purported muscle relaxant and was highly addictive. The FDA recommends carisoprodol only for acute treatment for two to three weeks at a time.

5. It was well known that the combination of high-dose opioids, including oxycodone or hydrocodone and carisoprodol significantly increased the risk of patient intoxication and overdose. Moreover, prescribing oxycodone or hydrocodone and carisoprodol often created a significant risk of diversion because the two drugs, prescribed together, were often highly abused and sought for a non-legitimate medical purpose due to the increased "high" a user may experience from taking hydrocodone or oxycodone along with carisoprodol.

6.      Accordingly, for a treating physician to prescribe the combination of high-dose opioids and carisoprodol for a legitimate medical purpose, the physician needed to determine, at a minimum, that the benefits of the drugs outweighed the risks to the patient's life.

7.      Medical practitioners, such as pharmacists, physicians, and nurse practitioners, who were authorized to prescribe or distribute controlled substances by the jurisdiction in which they were licensed to practice were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were registered with the Attorney General of the United States. 21 U.S.C. § 822(b). Upon application by the practitioner, the Drug Enforcement Administration ("DEA") assigned a unique registration number to each qualifying medical practitioner including physicians, pharmacies, and nurse practitioners. Under Texas law, Nurse Practitioners were limited to prescribing Schedule III through Schedule V controlled substances.

8.      Chapter 21 of the Code of Federal Regulations, Section 1306.04 governed the issuance of prescriptions and provided, among other things, that a prescription for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

9.      Chapter 21 of the Code of Federal Regulations, Section 1306.06 governed the filling of prescriptions and provided: "A prescription for a controlled substance may only be filled

by a pharmacist, acting in the usual course of his professional practice and either registered individually or employed in a registered pharmacy, a registered central fill pharmacy, or registered institutional practitioner."

10. All prescriptions for controlled substances must be "dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner." 21 C.F.R. § 1306.05(a). "The refilling of a prescription for a controlled substance listed in Schedule II is prohibited." 21 C.F.R. § 1306.12(a); 21 U.S.C. § 829(a).

11. The Texas Prescription Monitoring Program ("PMP") was a database of all reported prescriptions for controlled substances that were issued and dispensed in Texas. The database was maintained by the Texas Department of Public Safety ("DPS") up until September 1, 2016, and thereafter by the Texas State Board of Pharmacy ("TSBP"). Pharmacies were required to report to the PMP all controlled substances dispensed, including: the patient's name, the particular controlled substance and dosage dispensed, the quantity dispensed, the number of days supplied, the prescribing physician's name, the date the prescription was issued, the dispensing pharmacy's name, the type of payment, and the date the controlled substances were dispensed.

12. TSBP Rule 291.29 related to the Professional Responsibility of Pharmacists, and instructed a pharmacist to make every reasonable effort to ensure that any prescription drug order has be issued for a "legitimate medical purpose by a practitioner in the course of medical practice."

13. TSBP Rule 291.29(c) provided reasons to suspect that a prescription may have been authorized in the absence of a valid patient–practitioner relationship or in violation of the practitioner's standard of practice, including:

    a. a disproportionate number of patients of the practitioner receive controlled substances;

    b. the manner in which the prescriptions are authorized by the practitioner or received by the pharmacy;

    c. the geographical distance between the practitioner and the patient or between the pharmacy and the patient;

    d. knowledge by the pharmacist that the patient has exhibited doctor-shopping or pharmacy-shopping tendencies.

14. When pharmacies obtained a pharmacy license, TSBP distributed to pharmacies a document called: "Red Flags Check List for Pharmacies, YOU MIGHT BE A PILL MILL IF...," which largely mimicked TSBP Rule 291.29(f). The document identified the following "red flags," among others, related to non-therapeutic dispensing of controlled substances:

    a. the pharmacy dispenses a reasonably discernible pattern of substantially identical prescriptions for the same controlled substances, potentially paired with other drugs, for numerous persons, indicating a lack of individual drug therapy in prescriptions issued by the practitioner;

    b. the pharmacy operates with limited hours of operation or closes after a certain threshold of controlled substance prescriptions are dispensed;

    c. prescriptions by a prescriber presented to the pharmacy are routinely for controlled substances commonly known to be abused drugs, including opioids, benzodiazepines, muscle relaxants, psychostimulants, and/or cough syrups containing codeine, or any combination of these drugs;

    d. prescriptions for controlled substances are commonly for the highest strength of the drug and/or for large quantities (e.g., monthly supply), indicating a lack of individual drug therapy in prescriptions issued by the practitioner;

  e. dangerous drugs or over-the-counter products (e.g., multi-vitamins or laxatives) are consistently added by the prescriber to prescriptions for controlled substances presented to the pharmacy, indicating a lack of individual drug therapy in prescriptions issued by the practitioner;

  f. the practitioner's clinic is not registered as, and not exempted from registration as, a pain management clinic by the Texas Medical Board, despite prescriptions by the practitioner presented to the pharmacy indicating that the practitioner is mostly prescribing opioids, benzodiazepines, barbiturates, or carisoprodol, but not including suboxone, or any combination of these drugs;

  g. the controlled substance(s) or the quantity of the controlled substance(s) prescribed are inconsistent with the practitioner's area of medical practice;

  h. the Texas Prescription Monitoring Program indicates the person presenting the prescriptions is obtaining similar drugs from multiple practitioners, and/or that the persons is being dispensed similar drugs at multiple pharmacies;

  i. person's pay with cash or credit card more often than insurance;

  j. the pharmacy charges and persons are willing to pay more for controlled substances than they would at a nearby pharmacy;

  k. sporadic and non-consistent dispensing volume (including zero dispensing) varies from day to day, and week to week; and

  l. the pharmacy routinely orders controlled substances from more than one drug supplier.

## ENTITIES AND DEFENDANTS

15. Sunnyside Medical, PLLC, which did business as SUNNYSIDE WELLNESS had two locations. SUNNYSIDE WELLNESS, located at 4561 Edfield Street, Houston, Texas 77051 (SUNNYSIDE #1), was opened in or around May 2018. The second SUNNYSIDE WELLNESS was located at 5400 Pinemont Drive, Houston, Texas 77092 (SUNNYSIDE #2), and was opened in or around April 2019.

16. CORNERSTONE is retail pharmacy located at 7255 Bissonnet Street, in Houston, Texas 77074. CORNERSTONE became registered with the DEA, and has been licensed with the Texas State Board of Pharmacy ("TSBP"), since approximately 2009. CORNERSTONE is authorized to dispense Schedule II through V controlled substances.

17. **JONATHAN ROSENFIELD, M.D. (1)** ("**ROSENFIELD**"), a resident of Fulton County, Georgia, was a Medical Doctor, and was licensed to practice medicine in the State of Texas since in or around December 2017. According to Texas Secretary of State Records, **ROSENFIELD** formed SUNNYSIDE MEDICAL, PLLC, under the assumed name SUNNYSIDE WELLNESS in or around October 4, 2018. Along with his business partners, **ROSENFIELD** owned or controlled SUNNYSIDE WELLNESS, and was the Medical Director for SUNNYSIDE #1 and #2 where he prescribed large volumes of controlled substances—primarily oxycodone 30mg, hydrocodone 10/325mg, and carisoprodol 350mg.

18. **DOCTOR A** was a Medical Doctor licensed to practice medicine in the State of Texas. **DOCTOR A** purported to treat patients for pain at SUNNYSIDE #2, where he purportedly prescribed large volumes of controlled substances—primarily oxycodone 30mg and hydrocodone 10/325mg.

19. **ELMER TAYLOR (2)** ("**TAYLOR**"), a resident of Fort Bend County, Texas, owned or controlled the SUNNYSIDE clinics, along with **ROSENFIELD** and **ALANTHA STEWART**. **TAYLOR** also recruited patient-runners and purported patients to buy controlled substances for illegitimate prescriptions issued by **ROSENFIELD** and **DOCTOR A**.

20. **ALANTHA STEWART (3)** ("**STEWART**"), a resident of Fort Bend County, Texas owned or controlled SUNNYSIDE #1 and #2 along with **ROSENFIELD** and her husband, **TAYLOR**. According to Texas Secretary of State Records, **STEWART** formed SUNNY SIDE WELLNESS CENTER, LLC on May 17, 2018.

21. **KWANA BROUSSARD (4)** ("**BROUSSARD**"), a resident of Fort Bend County, Texas, was a crew leader who coordinated with clinic owners, pharmacists, other crew leaders, runners, and others, to pay purported patients to obtain illegitimate prescriptions from clinics, and to fill those prescriptions at pharmacies. **BROUSSARD** also paid the clinics, including SUNNYSIDE #1 and #2 to issue the prescriptions, and the pharmacies, including CORNERSTONE, to fill the prescriptions. The prescriptions were often for oxycodone, hydrocodone, or carisoprodol.

22. **RICKY WAYNE MOTEN (5)** ("**MOTEN**"), a resident of Harris County, Texas, was the head of a drug trafficking organization in Houston, Texas. **MOTEN** coordinated with **TAYLOR**, **BROUSSARD**, and other Houston-area clinics, pharmacies, crew leaders, and runners, the purchase and illegal diversion of illegitimate prescriptions issued by Houston-area doctors, including **ROSENFIELD** and **DOCTOR A**, and filled at Houston-area pharmacies, including CORNERSTONE.

23. **SOKARI MANUEL BOBMANUEL, R.P.H. (6)** ("**BOBMANUEL**"), often known as "Momma," a resident of Fort Bend County, Texas, was the owner and Pharmacist in Charge ("PIC") at CORNERSTONE, located at 7255 Bissonnet Street, in Houston, Texas 77074.

**BOBMANUEL** dispensed thousands of prescriptions for controlled substances, and often charged exorbitant prices for the combination of oxycodone or hydrocodone and carisoprodol.

24. **ARDELLA FISHER, F.N.P. (7)** ("**FISHER**"), a resident of Fort Bend County, Texas, was a Family Nurse Practitioner licensed to practice in the State of Texas since November 2017, and was a registered nurse for several years before that. Beginning in or around June 2018, **FISHER** worked at SUNNYSIDE #1, where **ROSENFIELD** acted as her supervising physician.

25. **ENNA AMEDOME, F.N.P. (8)** ("**AMEDOME**"), a resident of Fort Bend County, Texas, was a Family Nurse Practitioner licensed to practice in the State of Texas since in or around November 2017. Beginning in or around April 2019, **AMEDOME** worked at SUNNYSIDE #2, where **DOCTOR A** acted as her supervising physician.

26. **OTUKAYODE ADELEKE OTUFALE (9)** ("**OTUFALE**"), a resident of Fort Bend County, Texas worked for **BOBMANUEL** at CORNERSTONE. **OTUFALE** was at one time a pharmacist, but TSBP revoked his licensed in or around August 2007. Nevertheless, **OTUFALE** assisted **BOBMANUEL** in dispensing thousands of prescriptions for controlled substances at CORNERSTONE.

27. **JASMINE MAYNES (10)** ("**MAYNES**"), a resident of Galveston County, Texas, was a Houston-area "crew-leader" who coordinated with clinics and pharmacies the purchase and illegal diversion of illegitimate prescriptions, many of which were written by **ROSENFIELD** and **DOCTOR A** and filled at CORNERSTONE.

28. **JABRAI PRICE (11)** ("**PRICE**"), a resident of Brazos County, Texas, was a Houston-area "crew leader" who coordinated with clinics and pharmacies the purchase and illegal

9

diversion of illegitimate prescriptions, many of which were written by **ROSENFIELD** and **DOCTOR A** and filled at CORNERSTONE.

29. **SHAWNEECE DEYAMPERT (12)** ("DEYAMPERT"), a resident of Harris County, Texas, worked at Sunnyside #1, where she was referred to as the "money person." DEYAMPERT was the niece of TAYLOR.

**COUNT 1**
**Conspiracy to Unlawfully Distribute and Dispense Controlled Substances**
**(21 U.S.C. § 846)**

30. Paragraphs 1 through 29 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

31. From in or around May 2018 through in or around August 2019, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, Defendants

**JONATHAN ROSENFIELD, M.D.,**
**ELMER TAYLOR,**
**ALANTHA STEWART,**
**KWANA BROUSSARD,**
**RICKY MOTEN,**
**SOKARI MANUEL BOBMANUEL,**
**ARDELLA FISHER,**
**ENNA AMEDOME,**
**OTUKAYODE ADELEKE OTUFALE,**
**JASMINE MAYNES,**
**JABRAI PRICE,** and
**SHAWNEECE DEYAMPERT**

knowingly and intentionally combined, conspired, confederated, and agreed together and with each other, and with others known and unknown to the Grand Jury, to violate Title 21, United

States Code, Section 841(a)(1), that is, to knowingly and intentionally unlawfully distribute and dispense, mixtures and substances containing a detectable amount of controlled substances, including oxycodone and hydrocodone, both Schedule II controlled substances, and other controlled substances, outside the usual course of professional practice and not for a legitimate medical purpose.

All in violation of Title 21, United States Code, Section 846.

## Purpose of the Conspiracy

32. It was a purpose and object of the conspiracy for the Defendants, and others known and unknown to the Grand Jury to unlawfully enrich themselves by, among other things: (a) distributing and dispensing controlled substances outside the usual course of professional practice and not for a legitimate medical purpose; (b) generating large profits from distributing and dispensing those controlled substances; and (c) diverting the proceeds from distributing and dispensing those controlled substances for their personal use and benefit.

## Manner and Means of the Conspiracy

The manner and means by which the Defendants sought to accomplish the purpose and object of the conspiracy included, among other things:

33. **ROSENFIELD** used his status as a licensed physician, his DEA Registration Number, his purported supervision of **FISHER**, and his medical practices SUNNYSIDE #1 and #2, to knowingly prescribe controlled substances, including oxycodone, hydrocodone, and carisoprodol, outside the usual course of professional practice and not for a legitimate medical purpose.

11

34. **ROSENFIELD**'s prescribing habits demonstrated a gross lack of individualized care for his purported patients: the vast majority of **ROSENFIELD**'s prescriptions were for oxycodone 30mg, hydrocodone 10/325mg, and carisoprodol 350mg, the highest dosage strengths of hydrocodone and carisoprodol, and the highest short-acting dosage strength of oxycodone, and were for same or substantially similar dosage units (pills)—105 to 120 pills of oxycodone or hydrocodone, and 90 pills of carisoprodol. This highly addictive and dangerous combination of oxycodone and carisoprodol or hydrocodone and carisoprodol, two components of the highly diverted "Houston cocktail," was prescribed outside the usual course of professional practice and with no legitimate medical purpose.

35. **DOCTOR A** used his status as a licensed physician, his DEA Registration Number, his purported supervision of **AMEDOME**, and SUNNYSIDE #2, to prescribe controlled substances, including oxycodone and hydrocodone, outside the usual course of professional practice and not for a legitimate medical purpose.

36. **DOCTOR A**'s prescribing habits also demonstrated a gross lack of individualized care for his purported patients: the vast majority of **DOCTOR A**'s prescriptions were for oxycodone 30mg, and hydrocodone 10/325mg, the most potent dosage strengths of these drugs, and were for the same or substantially similar dosage units—105 to 120 pills of oxycodone or hydrocodone.

37. **TAYLOR**, **STEWART**, and **DAYEMPERT**, obtained purported patients—customers—from crew leaders, runners, and others, including **BROUSSARD**, **PRICE**, **MAYNES**, and **MOTEN**, to visit SUNNYSIDE #1 and #2. **BROUSSARD, PRICE, MAYNES, and MOTEN** often paid these individuals to pose as patients in exchange for obtaining prescriptions for controlled substances at Houston-area clinics, including SUNNYSIDE #1 and #2.

38. **TAYLOR, STEWART, DEYAMPERT**, and other employees of the SUNNYSIDE clinics accepted cash only—ranging from $250 to $300 for hydrocodone, and $500 for oxycodone—from crew leader and runners, in exchange for illegal prescriptions for oxycodone, hydrocodone, carisoprodol, and other drugs that **ROSENFIELD** and **DOCTOR A** purportedly prescribed to individuals posing as patients at SUNNYSIDE #1 and #2.

39. **FISHER** and **AMEDOME** used their status as licensed Family Nurse Practitioners and their DEA Registration Numbers to make it appear as if SUNNYSIDE #1 and #2 were operating legitimately by purporting to see and treat patients at those locations. In reality, **ROSENFIELD** and **DOCTOR A** were often absent from SUNNYSIDE—and **ROSENFIELD** was often out of state—and **FISHER** and **AMEDOME** conducted only perfunctory examinations that almost always resulted in a prescription purportedly from **ROSENFIELD** or **DOCTOR A** for dangerous and highly addictive controlled substances, including oxycodone, hydrocodone, or carisoprodol.

40. **ROSENFIELD, DOCTOR A, FISHER**, and **AMEDOME** often ignored obvious signs of addiction and drug-diversion, and nevertheless approved prescriptions for controlled substances.

41. At times when **ROSENFIELD** was absent or out of state, and with **ROSENFIELD**'s consent and approval, **STEWART** and **TAYLOR** also issued electronic prescriptions for controlled substances to individuals, knowing those individuals had received no medical examination whatsoever, and therefore the prescriptions were issued with no legitimate medical purpose and outside the usual course of professional practice.

42. After a paper or electronic prescription was purportedly issued by **ROSENFIELD** or **DOCTOR A** at SUNNYSIDE #1 or #2, crew leaders and runners including **BROUSSARD**,

13

**PRICE**, **MAYNES**, and **MOTEN** filled or had the individuals posing as patients fill, those prescriptions at Houston-area pharmacies, including CORNERSTONE.

43. **BOBMANUEL** used her status as a licensed pharmacist, her DEA Registration Number, and her pharmacy CORNERSTONE, to knowingly dispense controlled substances, including oxycodone, hydrocodone, and carisoprodol, outside the usual course of professional practice and not for a legitimate medical purpose.

44. **BOBMANUEL**, in coordination with **OTUFALE**, knowingly filled illegitimate prescriptions for oxycodone, hydrocodone, and carisoprodol, in exchange for cash for illegitimate patients that crew leaders and runners, including **BROUSSARD, TAYLOR**, and others trafficked to CORNERSTONE. **BOBMANUEL** often charged over approximately $1,200 to fill just one of those prescriptions, well over market value for legitimate prescriptions.

45. The prescriptions **BOBMANUEL** filled at CORNERSTONE were almost always for oxycodone 30mg, hydrocodone 10/325mg, and carisoprodol 350mg—the highest dosage strengths of hydrocodone and carisoprodol, and the highest short-acting dosage strength of oxycodone. Though **BOBMANUEL** almost always ordered these high-strength controlled substances from multiple drug distributors, CORNERSTONE's stock was often low due to the high demand for these controlled substances.

46. **BOBMANUEL** and **OTUFALE's** management, operation, and filling prescriptions at CORNERSTONE exhibited many, if not all, of the pill-mill Red Flags warned against by TSBP.

47. **BROUSSARD, PRICE, MAYNES, MOTEN** and others diverted and sold on the black market the illegally obtained controlled substances that were purportedly prescribed by

**ROSENFIELD, DOCTOR A**, and other physicians, and that were dispensed by **BOBMANUEL** at CORNERSTONE and by other pharmacies.

48. From in or around January 2018 through in or around August 2019, **ROSENFIELD** issued prescriptions for almost 1.9 million controlled substance pills: approximately 752,000 pills of oxycodone 30mg, approximately 419,000 pills of hydrocodone 10/325mg, and approximately 562,000 pills of carisoprodol 350mg.

49. In less than a three-month period from in or around April 2019 through in or around August 2019, while **DOCTOR A** was the supervising physician at SUNNYSIDE #2, **DOCTOR A** purportedly issued prescriptions for approximately 283,000 controlled substance pills—approximately 243,000 pills of oxycodone 30mg and approximately 35,000 pills of hydrocodone 10/325mg.

50. From in or around October 2016 through in or around August 2019, CORNERSTONE dispensed approximately 376,000 controlled substance pills—approximately 109,000 pills of oxycodone 30mg, 120,000 pills of hydrocodone 10/325mg, and 125,000 pills of carisoprodol 350mg.

All in violation of Title 21, United States Code, Section 846.

### COUNTS 2-10
**Unlawfully Distributing and Dispensing Controlled Substances and Aiding and Abetting**
**(21 U.S.C. § 841 & 18 U.S.C. § 2)**

51. Paragraphs 1 through 29, and 33 through 50 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

52. On or about the dates specified below, in the Houston Division of the Southern District of Texas, the Defendants specified below, aiding and abetting and aided and abetted by others known and unknown to the Grand Jury, did knowingly and intentionally unlawfully

15

distribute and dispense, outside the usual course of professional practice and not for a legitimate medical purpose, the controlled substances alleged below:

| Count | Defendant(s) | Controlled Substance | On Or About Date | "Patient" Initials |
|---|---|---|---|---|
| 2 | JONATHAN ROSENFIELD, M.D., ELMER TAYLOR, ALANTHA STEWART, | Oxycodone 30mg | 07/24/18 | K.J. |
| 3 | JONATHAN ROSENFIELD, M.D., ELMER TAYLOR, ALANTHA STEWART, | Oxycodone 30mg | 07/24/18 | L.J. |
| 4 | JONATHAN ROSENFIELD, M.D., ELMER TAYLOR, ALANTHA STEWART, | Oxycodone 30mg | 07/24/18 | C.G. |
| 5 | JONATHAN ROSENFIELD, M.D., ELMER TAYLOR, ALANTHA STEWART, | Oxycodone 30mg | 07/24/18 | S.S. |
| 6 | JONATHAN ROSENFIELD, M.D., ELMER TAYLOR, ALANTHA STEWART, | Oxycodone 30mg | 07/24/18 | T.J. |
| 7 | JONATHAN ROSENFIELD, M.D., ELMER TAYLOR, ALANTHA STEWART, | Oxycodone 30mg | 07/24/18 | S.N. |
| 8 | JONATHAN ROSENFIELD, M.D., ARDELLA FISHER, F.N.P. | Hydrocodone 10/325mg | 05/16/19 | CI#3 |
| 9 | ENNA AMEDOME, F.N.P. | Oxycodone 30mg | 06/26/19 | CI#3 |
| 10 | ENNA AMEDOME, F.N.P. | Oxycodone 30mg | 06/26/19 | CI#4 |

All in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C), (b)(2) & Title 18, United States Code, Section 2.

## COUNT 11
### Maintaining a Drug-Involved Premises and Aiding and Abetting
### (21 U.S.C. § 856(a)(1) & 18 U.S.C. § 2))

53. Paragraphs 1 through 29, and 33 through 50 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

54. From in or around October 2016 through in or around August 2019, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, Defendant

**SOKARI MANUEL BOBMANUEL, R.P.H**

aiding and abetting and aided and abetted by others, did unlawfully and knowingly use and maintain a place known as Cornerstone Pharmacy located at 7255 Bissonnet Street, in Houston, Texas 77074, for the purpose of distributing Schedule II controlled substances, including oxycodone and hydrocodone, outside the usual course of professional practice and without a legitimate medical purpose.

All in violation of Title 21, United States Code, Section 856(a)(1) & Title 18, United States Code, Section 2.

## COUNT 12
### Maintaining a Drug-Involved Premises and Aiding and Abetting
### (21 U.S.C. § 856(a)(1) & 18 U.S.C. § 2))

55. Paragraphs 1 through 29 and 33 through 50 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

56. From in or around May 2018 through in or around August 2019, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, Defendants

**JONATHAN ROSENFIELD, M.D.**
**ELMER TAYLOR,** and

## ALANTHA STEWART,

aiding and abetting and aided and abetted by others, did unlawfully and knowingly use and maintain a place known as Sunnyside Medical, PLLC, doing business as Sunnyside Wellness, located at 4561 Edfield Street, Houston, Texas 77051, for the purpose of distributing Schedule II controlled substances, including oxycodone and hydrocodone, and other controlled substances, outside the usual course of professional practice and without a legitimate medical purpose.

All in violation of Title 21, United States Code, Section 856(a)(1) & Title 18, United States Code, Section 2.

## NOTICE OF CRIMINAL FORFEITURE
## (21 U.S.C. § 853(a))

57. Pursuant to Title 21, United States Code, Section 853(a), the United States of America gives notice to Defendants, that upon conviction of an offense in violation of Title 21, United States Code, Sections 841, 846, or 856 the following is subject to forfeiture:

    a. all property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such violation; and

    b. all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

### Money Judgment and Substitute Assets

58. The United States will seek the imposition of a money judgment against each Defendant upon conviction.

59. Defendants are notified that in the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the Defendants up to the amount of the money judgment against that Defendant.

A TRUE BILL

Original Signature on File

_____
FOREPERSON

RYAN K. PATRICK
UNITED STATES ATTORNEY

ALLAN MEDINA
ACTING CHIEF, HEALTH CARE FRAUD UNIT
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

_____
JASON KNUTSON
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE